

**Dated: March 31, 2025.**

_____
**CHRISTOPHER G. BRADLEY**
**UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| **RYAN ANDREW TAYLOR and** | § | **Case No. 24-10298-cgb** |
| **BRIDGET ANN TAYLOR,** | § | |
| | § | **Chapter 7** |
| **Debtors.** | § | |

## OPINION AND ORDER GRANTING IN PART
## AND DENYING IN PART MOTION TO COMPEL

### Introduction

This case presents the question of whether certain stock options belong to the Chapter 7 bankruptcy estate or to the debtor. The contested options were granted before the petition date but not vested (exercisable) until after it—and only if the debtor continued his employment for a set amount of time.

The Court determines that the portion of the options attributable to the debtor's postpetition labor belongs to the debtor and not the estate because it is "earnings" from the debtor's postpetition work. This result best follows the text of the relevant part of the Bankruptcy Code and aligns with the vast majority of precedent on this issue, although it departs from a 2001 opinion of a bankruptcy court in this district.

# Background

The facts appear to be uncontested. Ryan Andrew Taylor and Bridget Ann Taylor (the "Debtors") filed for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") on March 22, 2024 (the "Petition Date").[1] John Patrick Lowe was appointed as Chapter 7 trustee (the "Trustee").[2]

On November 8, 2021, several years before the Petition Date, Mr. Taylor was awarded a number of options pursuant to a U.S. Restricted Stock Unit Award Agreement (the "Contract").[3] The options vested as follows: the first 33% vested after one year; the second 33% after two years; and the final 34% (those at issue in this decision) after three years—so long as Mr. Taylor continued to work for his employer as of each date. Upon vesting, Mr. Taylor became "entitl[ed] . . . to receive one share of the Company's common stock for each RSU so vested."[4]

Before the Petition Date, the first two tranches of options had already vested, and Mr. Taylor had already received the shares he was entitled to.[5] As of the Petition Date, only a third remained unvested. The Debtors disclosed their ownership interest in the remaining options in their schedules filed in this bankruptcy proceeding.[6] Because Mr. Taylor ultimately remained with his employer, this final tranche finally

---

[1] Voluntary Pet. for Individuals Filing for Bankruptcy, ECF No. 1.

[2] Notice of Chapter 7 Bankruptcy Case, ECF No. 4.

[3] Ex. A to the Declaration (as defined below). The Contract characterizes the options as being granted on the date of the Contract: "the Company hereby grants to the Grantee the number of RSUs as provided in the Award Notice." Contract at ¶ 1.

[4] Ex. A to the Declaration. Mr. Taylor's employer's obligation is as follows: "As soon as practical after a Vesting Date, the Company shall deliver the RSU Shares which have vested on that date." Contract at ¶ 2.

[5] Mr. Taylor exercised 129 vested restricted stock units before the Petition Date. Unsworn Decl. of Ryan Andrew Taylor Under Penalty of Perjury, ECF No. 37 at 2.

[6] *See* Schedule A/B, Asset 18, ECF No. 1 at 12. While the Debtors did not claim any of the options as exempt, on November 7, 2024, they did file a Motion for the Entry of an Order Declaring Certain Property to Be Excluded from the Debtors' Estate [ECF No. 21] (the "Motion to Exclude"). The Trustee filed his response [ECF No. 23] to the Motion to Exclude, arguing that the relief requested should be made by adversary proceeding and not motion. The Debtors ultimately withdrew the Motion to Exclude [ECF No. 30].

vested as of November 8, 2024 (the "Final Vesting Date"), about seven months after the Petition Date.[7]

On November 11, 2024, the Trustee filed a Motion to Compel the Debtors to Liquidate Stock Options and to Turn the Sales Proceeds Over to the Trustee (the "Motion to Compel").[8] The Trustee noted that no exemption was claimed in the options and that bankruptcy law requires debtors to cooperate with the Trustee in obtaining possession of and liquidating their assets.[9]

The Debtors filed a response (the "Response"),[10] in which they conceded that the bankruptcy estate has the right to: (a) the value of the first two tranches of options that were vested prepetition, as well as (b) the portion of the value of the third tranche of options that—although not yet vested on the Petition Date—was "attributable" to his prepetition labor.

The Debtors contest the estate's rights in the value of the remainder of the options. They believe they have the right to retain the value of the options that (a) only became vested postpetition and (b) are "attributable" to Mr. Taylor's continuing to work for his employer between the Petition Date and the Final Vesting Date (the "Contested Options").[11] They also argue that the Debtors should not bear any increased tax burden as a result of the estate's realization of any of the options' value.

---

[7] A Fidelity Stock Plan Services document described as "Transaction details" [ECF No. 37, Ex. A at 6–7] reflects that on November 8, 2024, 66 units were distributed to Mr. Taylor, from which 17 units were withheld for federal taxes and Medicare based upon his election to receive "net shares" under the Contract.

[8] ECF No. 24.

[9] *See, e.g.*, 11 U.S.C. § 521(a)(3), (4); Bankruptcy Rule 4002.

[10] ECF No. 29.

[11] This is laid out in detail in the Declaration as well as Part A below. The Contract requires a total vesting period of 1,096 days, spanning from November 8, 2021, to November 8, 2024. The basic calculation for the third tranche of options is that the 865 days between the vesting start date (November 8, 2021) and the Petition Date (March 22, 2024) are attributed to prepetition efforts and thus inure to the benefit of the estate; the 231 days between the Petition Date and the Final Vesting Date are attributed to postpetition efforts and thus inure to the Debtors. Thus Mr. Taylor only seeks to keep 21.09% of the final tranche of options.

The Trustee filed his reply ("Reply"),[12] in which he argues that the Debtors' Response should be disregarded as untimely[13] and that the Debtors' position regarding the Contested Options was considered and rejected in an opinion from this district, *In re Dibiase*.[14] The Reply does not address the Debtors' argument concerning the tax burden.

The Debtors also filed a legal brief (the "Debtors' Brief")[15] and an unsworn declaration (the "Declaration")[16] in support of their position. They argue that the value of the Contested Options is best characterized as "earnings from services performed by an individual debtor after the commencement of the case," excluded from the estate by virtue of section 541(a)(6) of the Bankruptcy Code. They cite case law in support of their position: *In re DeNadai*[17] and *Allen v. Levey (In re Allen)*.[18] They contend that *Dibiase* was wrongly decided because the court failed to realize that "the value of the options depended substantially on the debtor's post-petition labor. The decision erroneously conflated the existence of a contingent pre-petition right (the stock option agreement) with the value generated by post-petition labor."[19] The Debtors' Brief also again urges that any tax burden the Debtors incur with relation to funds received by the estate as the result of the realization of the value of the options should be covered by the estate.

---

[12]  ECF No. 35.

[13]  The Court does not further address the untimeliness objection here. The Trustee is strictly correct, but the Court does not believe the effect of this untimeliness is to deny the Debtors' relief. Additionally, the prejudice to the Trustee is minimal here as the Debtors earlier asserted substantially similar legal arguments in the Motion to Exclude. Notably, the Response was filed on the same day, and just before, the Debtor's withdrew the Motion to Exclude. ECF Nos. 29 and 30. No doubt, the untimeliness put the Debtors at risk of the Court granting the Trustee the relief requested without further hearing. However, because the Court did not actually do so in this case, the Debtors' failure does not have a particular consequence, though their counsel is warned that future failures to abide by the governing rules may not yield such fortunate results.

[14]  270 B.R. 673 (Bankr. W.D. Tex. 2001).

[15]  Debtors' Trial Br. in Opp'n to the Trustee's Mot. to Compel the Debtors to Liquidate Stock Options and to Turn the Sales Proceeds Over to the Trustee, ECF No. 36.

[16]  Unsworn Decl. of Ryan Andrew Taylor Under Penalty of Perjury, ECF No. 37.

[17]  259 B.R. 801 (Bankr. D. Mass. 2001) ("*DeNadai* Bankruptcy Court Opinion"), aff'd sub nom., *DeNadai v. Preferred Cap. Mkts., Inc.*, 272 B.R. 21 (D. Mass. 2001) ("*DeNadai* District Court Opinion").

[18]  226 B.R. 857 (Bankr. N.D. Ill. 1998).

[19]  Debtors' Brief, ECF No. 36 at 9.

The Court held a hearing on this matter on January 7, 2025 (the "Hearing"). At the Hearing, the Debtors offered another argument. They argued that any nonvested options were not assets at all as of the Petition Date but were merely anticipated consideration to be received as part of an executory contract for personal services (*i.e.*, the Debtor's employment) that cannot be assumed or assigned by the Trustee. Accordingly, they orally requested to amend their schedules and assert that the Contract awarding the options was an executory contract. The Trustee, of course, had no opportunity to respond to or ever to consider this dramatically different argument in advance of the Hearing. There have been no further filings.

After the Hearing, the Court took the matter under advisement.

## Analysis

The Court's analysis is structured as follows. First, in section A, the Court determines that the Debtors should retain the value of the Contested Options because that value is Mr. Taylor's postpetition "earnings." In Section B, the Court discusses the means by which the Debtors should turn over to the Trustee whatever portion of the options' proceeds the Court holds he is entitled to administer on behalf of the estate. Finally, in section C, the Court addresses the argument that perhaps the contract governing the options should be considered an executory contract that could not be assumed by the Trustee and therefore should be abandoned to the Debtors, and that they should receive some or all of the options unvested as of the Petition Date. Although the Debtors did not timely urge this argument, and the Trustee did not have the opportunity to consider and respond to it, the Court will explain why it would not have brought any additional benefits to the Debtors anyway, because even if the Contract *is* treated as an executory contract and *is* deemed abandoned to the Debtors, the value of the options that vested prepetition or whose value is attributable to prepetition employment would still inure to the estate. In other words, either way, the Debtors would be entitled to the value of the Contested Options, but only those.

## A.    The value to be realized on the Contested Options constitutes postpetition "earnings" and therefore does not enter the bankruptcy estate.

Options, restricted stock units, and similar financial devices take different shapes and have different (and mixed) motivations, such as providing compensation for services of loyal employees, capitalizing on tax advantages, and aligning the interests of employees, officers, or directors with those of the enterprise as a whole. In addition to having various goals, they can also be structured in manifold ways: some are contingent on attaining particular financial targets or maintaining

employment; some provide the right to purchase stock at particular prices at particular times; and others (such as the options awarded to Mr. Taylor) confer the right to receive shares outright if the stated terms of employment are met. Because of these different goals and structures, there can be no universal rule for how to treat options under bankruptcy law.

In most cases that come before courts, options are awarded prepetition but only take on actual entitlement to value—the right to receive a share or to purchase a share at an advantageous price—based on the debtor's continued postpetition employment. This is the case with the Contested Options here. They were awarded prepetition but only vested postpetition and only based upon Mr. Taylor's postpetition work. The question in such cases is how to allocate rights between the *bankruptcy estate*—which generally includes all prepetition property as well as the proceeds and profits of it—and *debtors*, who in Chapter 7 cases have the right to keep their postpetition earnings.

Contingent rights of whatever sort generally become part of the bankruptcy estate created when a debtor files for bankruptcy relief. Section 541(a) of the Bankruptcy Code sweeps broadly, including "all legal or equitable interests of the debtor in property as of the commencement of the case," with very limited exceptions not applicable here.[20] The nonvested options that Mr. Taylor held as of the Petition Date are certainly some sort of "legal or equitable interests of the debtor in property" and therefore became part of the estate. Cases appear uniform on this.[21]

But the Contested Options at issue here only took on *value*—in that they entitled their holder to receive shares of stock—after the Petition Date and as a result of Mr. Taylor's continued work for his employer.[22]

This is where section 541(a)(6) enters the picture. That provision sweeps into the estate the "[p]roceeds, product, offspring, rents, or profits of or from property of

---

[20]  11 U.S.C. § 541(a)(1).

[21]  *See, e.g.*, *DeNadai* District Court Opinion, 272 B.R. at 28; *In re Taronji*, 174 B.R. 964, 967, 969–70 (Bankr. N.D. Ill. 1994); *In re Michener*, 342 B.R. 428, 430 (Bankr. D. Del. 2006) (collecting cases); *Dibiase*, 270 B.R. at 676.

[22]  In other cases, the entitlement is to purchase shares at a discount rather than to receive them outright, but the analysis is the same.

the estate," with a crucial exception for "such as are earnings from services performed by an individual debtor after the commencement of the case."[23]

This Court follows the majority of courts in finding that a valuable share of stock, to which each option provides an entitlement (whether to receive outright or to purchase at a discount), is the "proceeds . . . or profits" of the option.[24] A dictionary definition of *profit* is:

1. An advantageous gain or return; benefit.

2. Financial gain from a transaction or from a period of investment or business activity, usually calculated as income in excess of costs or as the final value of an asset in excess of its initial value.[25]

A dictionary definition of *proceeds* is: "The amount of money derived from a commercial or fundraising venture; the yield."[26] The term *proceeds* in the bankruptcy context may also be informed with the meaning given to it under commercial law more generally, as expressed in Article 9 of the Uniform Commercial Code.[27] In relevant part, that expansive definition provides:

(A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;

(B) whatever is collected on, or distributed on account of, collateral;

---

[23]  11 U.S.C. § 541(a)(6).

[24]  *See, e.g.*, *Taronji*, 174 B.R. at 969–71; *Michener*, 342 B.R. at 428 (so holding and discussing *Allen* and *DeNadai* as well). The Ninth Circuit's analysis in the roughly analogous *Ryerson* case is also instructive. *Rau v. Ryerson (In re Ryerson)*, 739 F.2d 1423, 1425–26 (9th Cir. 1984) (dividing lump sum due to terminated employee between estate and debtor based on value attributable to pre- and postpetition employment time periods).

[25]  *Profit*, Amer. Heritage Dictionary (5th ed. 2022).

[26]  *Proceeds*, Amer. Heritage Dictionary (5th ed. 2022).

[27]  It used to be said that the definition of proceeds in section 541 of the Bankruptcy Code was broader than that in Article 9 of the Uniform Commercial Code. *See, e.g.*, *Taronji*, 174 B.R. at 969 (collecting and discussing sources). But the UCC definition of proceeds was substantially broadened when amendments first promulgated in the 1999 revisions to Article 9, so this distinction may no longer be necessary. *Compare* old UCC 9-306(1) (amended 1994) *with* current 9-102(a)(64) (amended 1999).

(C) rights arising out of collateral . . . .[28]

Under any of these definitions, the shares (or value thereof) yielded out of options that vest or become exercisable postpetition plainly qualify as "proceeds" or "profits" of the options. This Court agrees with Judge Walrath of the Delaware bankruptcy court in her excellent 2006 *Michener* opinion that "[p]rofit realized upon exercise of an [employee stock option] and sale of the acquired stock is quite obviously 'proceeds' of the [option]."[29]

To take the next step, the Court also follows *Michener* and the vast majority of other courts in finding that these "proceeds . . . or profits," *insofar as they are attributable to postpetition labor*, qualify as "earnings from services performed by an individual debtor after the commencement of the case" and are thus excluded from the estate. Again, this seems obvious from the plain text of the statute. As dictionaries confirm, to "earn" means as follows:

1. To gain especially for the performance of service, labor, or work: *earned money by mowing lawns*.

2. To acquire or deserve as a result of effort or action: *She earned a reputation as a hard worker*.

3. To yield as return or profit: *a savings account that earns interest on deposited funds*.[30]

Congress could have used narrower terms—such as "wages," "tips," and so on—to narrow the forms of compensation for postpetition activity that would be excluded from the estate and to exclude other forms of earnings, such as stock options, commissions, etc., derived from or attributable to postpetition activities.[31] It chose instead to use the broader term "earnings," which as we have seen, turns on the concept of receipt as consideration for efforts expended.

---

[28]  UCC § 9-102(a)(64) (amended 2022).

[29]  342 B.R. at 432.

[30]  *Earn*, Amer. Heritage Dictionary (5th ed. 2022).

[31]  *Michener*, 342 B.R. at 424 (concluding that "[t]he term 'earnings' is certainly broad enough to include the profit realized from the exercise of an [employee stock option]" and citing *Litzler v. Sholdra (In re Sholdra)*, 270 B.R. 64, 72 (Bankr. N.D. Tex. 2001) ("Congress clearly intended by the term 'earnings' something broader than salary or wages. . . . Earnings refers to all income generated by an individual.")).

Here, the Contested Options are attributable to Mr. Taylor's postpetition labor and are thus his "earnings." If Mr. Taylor had not performed that labor, the Contested Options would not have yielded their value. The Contested Options represent the portion of the options that were unvested as of the Petition Date and that were earned after the Petition Date. The Debtors have provided the full detail in their Declaration, but the basic calculation runs as follows: from the inception of the Contract, in order for all of the options to vest and for Mr. Taylor to be entitled to the valuable shares, he had to work three years, or 1,096 days. At the time of the Petition Date, he had already worked 865 days, or 78.91% of the total 1,096 days. For this reason, he concedes not only that the value of both the first two tranches of already-vested options *but also* 78.91% of the value of the third-tranche options belong to the estate, because they are all attributable to prepetition work. But the remainder of the options—the Contested Options—are attributable to Mr. Taylor's postpetition work. Thus he seeks only 21.09% of the value of only the third-tranche options, which amounts to 14.05 shares out of the total 196 shares that were awarded in total.[32]

For these reasons, the Debtors must prevail as to the value of the Contested Options, which represents Mr. Taylor's postpetition "earnings." Although the factual context and precise analysis are not always identical, the principles articulated and outcome reached above have been found persuasive by virtually every court to address this tricky issue, across the country and at both the bankruptcy court and the district and circuit court levels.[33]

The primary authority to the contrary is the *Dibiase* case, from a bankruptcy court of this district, the reasoning of which has been followed by one other court, in the *Carlton* case from the bankruptcy court for the Southern District of Florida.[34] The *Dibiase* opinion is learned and thorough and raises interesting arguments, and the Court does not disagree with its conclusions lightly. But in the end, the Court believes that the *Dibiase* opinion is not persuasive.

The Court takes issue with *Dibiase*'s reading of section 541(a)(6) in two respects—its view of what is swept into the estate as "proceeds . . . or profits,"

---

[32] For a similar calculation, see *In re Allen*, 226 B.R. 857, 867–68 (Bankr. N.D. Ill. 1998).

[33] A partial list: *Michener*, 342 B.R. at 435; *DeNadai* Bankruptcy Court Opinion at 806–07; *DeNadai* District Court Opinion at 41; *Taronji*, 174 B.R. at 808–09; *Allen*, 226 B.R. at 868; *In re Lawton*, 261 B.R. 774, 780–81 (Bankr. M.D. Fla. 2001); *Stoebner v. Wick (In re Wick)*, 276 F.3d 412, 416–17 (8th Cir. 2002); s*ee also Ryerson*, 739 F.2d at 1426 (analogous rights to compensation based on length of employment).

[34] *In re Carlton*, 309 B.R. 67 (Bankr. S.D. Fla. 2004).

and what is then excluded as postpetition "earnings." *Dibiase*'s perspectives on these points are somewhat intertwined.

The *Dibiase* court denies that the value of the options (*i.e.*, the rights to purchase or receive shares upon vesting) comes into the estate as "[p]roceeds, product, offspring, rents, or profits of or from property of the estate." It explains in a footnote that it reads section 541(a)(6) as (only?) "designed to shelter the proceeds of a closely held business, such as a medical practice."[35] Perhaps this is the provision's primary purpose, but the text reflects no limitation to such contexts. Following Fifth Circuit and Supreme Court guidance, this Court seeks first and foremost to interpret the statute as written, neither to interpose equitable considerations to bend the statutory text nor to use interpretive principles or purposive lenses to narrow or expand the meaning of the language that Congress actually used in enacting the law.[36] The stock received from the exercise of an option—or what is called "vesting" in this case—seems comfortably to fit within the *textual* scope of section 541(a)(6).[37]

In addition—and this implicates the "earnings" point as well—*Dibiase* quibbles with the word "vested" (used in the contract at issue in that case as it is in the Contract before this Court) to describe the time at which the option holder becomes actually entitled to the relevant consideration—in our case, shares of stock; in *Dibiase*, the right to purchase shares of stock at an apparently advantageous price. *Dibiase* claims that the options' "'vesting schedule' in fact describes not a vesting program at all but rather a schedule for *exercising* the Option."[38] *Dibiase* places much emphasis on this distinction because options are usually "immediate[ly]" granted even though they are "subject to limitations in [their] exercise and subject

---

[35] *Dibiase*, 270 B.R. at 684 n.15; *accord Carlton*, 309 B.R. at 74 (construing § 541(a)(6) narrowly as intended to shelter the proceeds of a closely held business).

[36] *See, e.g., BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires [the court] to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'" (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992))); *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 486 (5th Cir. 2013) ("The task of statutory interpretation begins and, if possible, ends with the language of the statute.").

[37] This is why *Dibiase*'s affirmation that options are treated as property in Texas is beside the point. 270 B.R. at 679–82. No one doubts that. The contingent property rights represented by options are property of the estate. But what the parties are fighting about is the "proceeds . . . or profits" of those options. And the estate keeps such proceeds only insofar as they are not postpetition earnings of the debtor.

[38] 270 B.R. at 678 (emphasis original).

to defeasance,"[39] which is a "condition subsequent"; whereas, by contrast, with what the court calls "true 'vesting'" (it gives the example of retirement benefits), the rights are not "vested" until a "condition precedent" is met.[40]

This attempted distinction—which has no grounding in the Bankruptcy Code's actual language—is not compelling. As other courts have explained, the distinction between conditions subsequent and conditions precedent simply cannot bear the weight placed on it in *Dibiase*, particularly with no foundation in the applicable statute.[41] The Bankruptcy Code's actual language invites considerations of economic realities, not finespun legal-theoretical distinctions. With both traditional retirement benefit plans and stock options, the right to actually reap a promised benefit is typically earned through continued employment to various set dates. The "immediate" grant of an option—property right though it may be (and thus property of the estate)—does not confer any property right in the promised benefit. Nor does the option itself in some way itself "become" that value. Rather, if the contingency is met, it merely provides an entitlement to that eventual benefit, whether it be a straightforward grant of stock or the right to purchase that stock profitably. In other words, the benefit—the actual value—is the "proceeds . . . or profits of or from" the option, fitting exactly into the statutory framework of section 541(a)(6).

Furthermore, those "proceeds . . . or profits of or from" the option *are* "earn[ed] from services performed by an individual debtor" by performing his job duties for the requisite period. This plain conclusion, too, falls casualty to *Dibiase*'s insistence of the distinction between conditions precedent and conditions subsequent. *Dibiase* revealingly downplays the debtor's postpetition effort in its analysis, at one point literally and quite remarkably stating that "continued employment is a *non-event*," merely the "maintenance of the status quo."[42] This is simply not a sustainable characterization of the actual facts either of *Dibiase* or of the case before this Court. The text of the Bankruptcy Code seems clear on this question. If the "maintenance of the status quo" is "performing your job," and you

---

[39] *Id*. at 679.

[40] *Id*. at 678–79. Notably, *Dibiase* does not even mention Judge Wedoff's excellent opinion in *Taronji*, which considers and rejects this "condition subsequent" argument. 174 B.R. at 971.

[41] *See Michener*, 342 B.R. at 433–34 (criticizing *Dibiase*'s use of "outmoded distinctions" and quoting *Simeone v. First Bank Nat'l Ass'n*, 971 F.2d 103, 106 n.3 (8th Cir. 1992) (noting the "general consensus that the distinction between conditions precedent and subsequent has little substantive meaning")).

[42] 270 B.R. at 687 (emphasis in original).

become entitled to some amounts of money because of doing that job, *another word for those amounts of money is "earnings,"*[43] which the Bankruptcy Code says you get to keep.

The options were not a gratuity: they were granted by an employer to an employee as part of a commercial employment transaction. As such, they were an object of exchange, Mr. Taylor providing labor to the employer and the employer compensating him, in part, with options. Although the options were "granted" in nascent form long before the Petition Date, they only "vested"—and thus provided Mr. Taylor with the entitlement to a share of valuable stock each—on the various later dates and *only if Mr. Taylor continued to work for his employer*. By virtue of his labor, Mr. Taylor "earned" the right to the "proceeds . . . or profits" of his various options. This is vividly illustrated when one considers the economics of most option contracts in a world where at-will employment is the default. Assuming that employment is at-will (as it appears to be in both *Dibiase* and for Mr. Taylor here), an employer would not keep an employee like Mr. Taylor on the payroll until the options were exercisable unless the employee was *doing his job* and doing it well enough to be worth the consideration being granted, both in terms of salary and the value of the options. An employee's labor for consideration is *not a non-event*—it is how the employee *earns* the consideration.[44] This is not due to some equitable invention of a court but rather a simple application of the meaning of the text of section 541(a)(6). It may also be the equitable result, but this Court need not and does not rely on any such analysis. It is the result demanded by the text, it is supported by a large body of persuasive case law, and this Court will follow it.

**B.    The Debtors can choose how they wish to convey the value of the options to the estate, including in ways that will minimize tax burden.**

The Debtors have expressed concern that whatever percentage of the options the Court ends up awarding to the estate, they themselves should not bear an

---

[43]   *Dibiase* offers various analogies, which this Court does not find compelling and which Judge Walrath effectively answers with an analogy of her own. *Michener*, 342 B.R. at 434; *Dibiase*, 270 B.R. at 686.

[44]   The narrowness of *Dibiase*'s distinction is underscored again in a footnote where it states an "obvious exception, of course" to its holding. 270 B.R. at 685 n.18. It states that a different result would obtain if the stock options were awarded "on an annual basis, tied directly to the performance of the company," which therefore "do represent compensation for work done and are truly earned." *Id*. This Court cannot discern a clear or principled statutory basis for holding that working for express performance targets is "earning" option value whereas other work is not.

12

increased tax burden due to value realized by the estate. At the Hearing, the Trustee proposed several ways in which the Debtors could convey either the options or their value to the estate in a tax-efficient fashion. Each approach might have costs and benefits to the Debtors (such as involving Mr. Taylor's employer in the situation). However, as the record reflects the option value has already been distributed, a portion already withheld for taxes, and a tax burden already incurred by Mr. Taylor,[45] the Court believes that the best approach is for the experienced trustee and experienced counsel to the Debtors to confer and determine how to provide the estate with the value of the options to which it is entitled—without any unnecessary deductions. If they cannot reach an agreement, they should bring the dispute to the Court for further consideration.

**C.    Even if the Contract that awarded and provided for the vesting of the options was an executory contract that was abandoned to the Debtors, they would still only be entitled to the value of the Contested Options.**

At the Hearing, the Debtors presented a different and novel argument to retain the Contested Options (and perhaps even more: all of the options unvested as of the Petition Date).[46] They contended that, as of the Petition Date, the non-exercised options were not *assets* but merely *potential products of an executory contract for personal services* and they should therefore be excluded from the estate.

The Court is somewhat reluctant to indulge this argument because it was not presented in enough detail either in the Hearing or in pre- or post-hearing briefing for the Court to consider it fully (or for the Trustee to rebut it). And, generally speaking, the Court does not wish to reward "laying behind the log" (although the Court does not impute any such intention to Debtors' counsel in this particular case). But a brief explanation of why the Court does not consider this argument persuasive can be given.

The questions presented by the Debtors' argument are whether the Contract was executory; if so, whether the estate's rejection of it equates to an abandonment of it to the Debtors, who may benefit from it; and if so, whether that means the Contested Options, or perhaps all of the third tranche of the options (including the

---

[45]    *See supra* note 7.

[46]    Because their argument was presented orally only, the Court's understanding of it may be imperfect at best. This opinion characterizes it as fairly as possible under the circumstances.

portion unvested on the Petition Date but attributable to prepetition work), should be awarded to the Debtors.

### 1. The Contract was likely an executory contract on the Petition Date.

First: *was* the Contract executory as of the Petition Date? Whether or not a contract governing the award of employee stock options is executory for purposes of bankruptcy law is not completely clear.

On the one hand, there are grounds for skepticism. As is well known, the Bankruptcy Code lacks a definition of what it means by "executory contracts." Historically, the leading test (including in the Fifth Circuit) for determining whether a contract is "executory" has been the so-called Countryman test, named after law professor Vern Countryman, who wrote a couple of influential articles explicating it.[47] In short, the test is whether "the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."[48] In its recent *Falcon V* decision, the Fifth Circuit extensively and favorably quoted a Third Circuit case as explaining the "logic" of the Countryman test:

> [T]he Countryman test attempts to foolproof the debtor's choice to assume or reject contracts; thus, the debtor only has that flexibility for executory contracts—those contracts where there could be uncertainty about whether they are valuable or burdensome. A helpful perspective is to view executory contracts as a combination of assets and liabilities to the bankruptcy estate; the performance the nonbankrupt owes the debtor constitutes an asset, and the performance the debtor owes the nonbankrupt is a liability. Under this framework, a contract where the debtor fully performed all material obligations, but the nonbankrupt counterparty has not, cannot be executory; that contract can be viewed as just an asset of the estate with no liability. Treating it as an executory contract risks inadvertent rejection because the debtor would in effect be giving up an asset by rejecting it. On the other extreme, where the counterparty performed but the debtor has not, the contract is also not

---

[47] *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439 (1973); *Executory Contracts in Bankruptcy: Part II*, 57 Minn. L. Rev. 479 (1974). On the adoption of the Countryman test, see *Argonaut Ins. Co. v. Falcon V, L.L.C. (In re Falcon V, L.L.C.)*, 44 F.4th 348, 354 n.4 (5th Cir. 2022).

[48] *Executory Contracts in Bankruptcy: Part I*, *supra* note 47, at 460.

> executory because it is only a liability for the estate. Treating it as an executory contract risks inadvertent assumption, for the debtor would effectively be agreeing to pay the liability in full when the counterparty should instead pursue the claim against the estate like other (typically unsecured) creditors. . . . *Only where a contract has at least one material unperformed obligation on each side—that is, where there can be uncertainty if the contract is a net asset or liability for the debtor—do we invite the debtor's business judgment on whether the contract should be assumed or rejected.*[49]

Notable for our purposes is that this "logic" places the mutuality of obligations—the *mix* of assets and liabilities—at the core of its understanding of executoriness. This "logic" of executoriness strongly suggests that if a contract only imposes obligations on the debtor (and thus is only a *liability* from the estate's perspective), or if a contract only imposes obligations on the counterparty (and thus is only an *asset* from the estate's perspective), it should not be considered an executory contract.

Applying the Countryman test rigorously, numerous courts and commentators opine that option contracts do not qualify as executory contracts because they only obligate one party to perform—the optionor (and then, of course, only if the option is exercised by the optionee).[50] An optionee is not *obligated* to do anything; it may do nothing and simply let the option expire without "breaching" any obligation. Thus there are not material *obligations* remaining to be "executed" on both sides. Options are *assets* of the estate,[51] untainted with *liability*; in other words, the crucial element

---

[49] *Falcon V*, 44 F.4th at 353 (quoting *Spyglass Media Grp. v. Bruce Cohen Prods. (In re Weinstein Co. Holdings)*, 997 F.3d 497, 504–05 (3d Cir. 2021) (emphasis added)).

[50] *Unsecured Creditors' Comm. v. Southmark Corp. (In re Robert L. Helms Constr. & Dev. Co., Inc.)*, 139 F.3d 702, 705 (9th Cir. 1998); *Bronner v. Chenoweth-Massie P'ship (In re Nat'l Fin. Realty Tr.)*, 226 B.R. 586, 590 (Bankr. W.D. Ky. 1998) (collecting cases and following this view as more persuasive); Charles Jordan Tabb, *Law of Bankruptcy* § 8.2 (5th ed. 2020) ("Using the Countryman definition, an option contract simply cannot be executory."); John A.E. Pottow, *A New Approach to Executory Contracts*, 96 Tex. L. Rev. 1437, 1448 (2018) (Countryman test not met by standard option contract); Jay Lawrence Westbrook & Kelsi Stayart White, *The Demystification of Contracts in Bankruptcy*, 91 Am. Bankr. L.J. 481, 502 (2017) ("[I]t is easy to see how courts applying material breach find options 'non-executory'—unilateral contracts like options inevitably fail the material breach test.").

[51] *See, e.g.*, *BNY, Cap. Funding LLC v. U.S. Airways, Inc.*, 345 B.R. 549, 556 (Bankr. E.D. Va. 2006) (characterizing "an unexercised option" as merely "property of U.S. Airways's bankruptcy estate"); Pottow, *supra* note 50, at 1455 ("If the optioner ever asks the debtor whether the option is 'assumed,' the debtor can just respond she no more needs to assume the

of mutuality—emphatically placed at the core of the executoriness test by the *Falcon V* opinion—appears lacking.

Nevertheless, there are some weighty authorities on the other side of the issue, holding that option contracts meet the Countryman test. These authorities cite to historical sources, mostly not in the bankruptcy context, adopting a more capacious understanding of executoriness or of the sort of remaining "obligations" that qualify a contract as executory.[52]

The Fifth Circuit appears to fall into the camp that holds option contracts to be executory. The clearest Fifth Circuit case appears to be *Rivercity v. Herpel (In re Jackson Brewing Co.)*,[53] which was decided under the pre-Bankruptcy Code Bankruptcy Act. *Jackson Brewing* involved the rejection of an option to purchase real property of the estate. The court approved the rejection in a short opinion, which itself attached and "adopt[ed]" the opinion of the lower court.[54] That lower court found that the option met the Fifth Circuit's then-definition of an executory contract

---

option than she needs to assume the drill press in the factory: it's all valuable property of the estate to be deployed in due course.").

[52] *See, e.g.*, *In re Simon Transp. Servs., Inc.*, 292 B.R. 207, 219–20 (Bankr. D. Utah 2003) (providing extensive discussion including of broader tests of executoriness), *subsequently dismissed*, 138 F. App'x 52 (10th Cir. 2005) (unpublished); *In re III Enters., Inc. V*, 163 B.R. 453, 468–69 (Bankr. E.D. Pa. 1994), *aff'd sub nom. Pueblo Chem., Inc. v. III Enters. Inc. V*, 169 B.R. 551 (E.D. Pa. 1994); *In re RoomStore, Inc.*, 473 B.R. 107, 112–14 (Bankr. E.D. Va. 2012) (holding option contract to be executory, but not necessarily disagreeing with the other line of authority—"One strong factor in my decision is that the [contract at issue] contains more than a simple purchase option or right of first refusal. Unlike the facts in the majority of cases . . . the court here is evaluating a complex contract with multiple continuing conditions."). Some cases on this side of the divide, particularly early cases, seem in some part to be motivated by a desire to vindicate what they perceive to be the underlying policy goals of the Bankruptcy Code provisions governing executory contracts. They appear concerned, for instance, that if a valuable option is not deemed executory, the estate will not be able to assume and thus benefit from it. This concern may be misguided: as numerous authorities have pointed out, a contract right (such as a valuable option), even if not executory, should still be considered an *asset* of the estate and can be exercised—there is no provision of bankruptcy law vaporizing it just because it cannot be assumed. Countryman himself supports this view. *Executory Contracts in Bankruptcy Part I*, *supra* note 47, at 458–60; *see also* Pottow, *supra* note 50, at 1451. *Cf.* Westbrook & White, *supra* note 50, at 498–503 (discussing and criticizing "non-executory limbo" and the treatment of option contracts by some courts)

[53] 567 F.2d 618 (5th Cir. 1978).

[54] *Id.* at 621.

as one in which "something remains to be done by *one or more* of the parties."[55] The lower court then explained that:

> [On the date] when this corporation was placed in corporate reorganization . . . in order to exercise the option, [optionee] had to (a) notify the debtor corporation of its intentions to purchase the property; (b) pay the purchase price; and (c) take title by a certain date. Thus the purported option agreement was an executory one at the time when this corporation was in reorganization.[56]

Although decided under pre-Bankruptcy Code law, the reasoning of *Jackson Brewing* as articulated by the lower court and adopted by the Fifth Circuit is likely still binding in this circuit. Pre-Code law generally governs unless displaced by clear statutory amendment or repudiated in the case law.[57]

It is true that the test applied by the Fifth Circuit in *Jackson Brewing* seems to differ from the Countryman test "by requiring performance due *on one side only* to create an executory contract,"[58] arguably lacking the element of mutuality emphasized at length in the recent *Falcon V* opinion.[59] Thus, an argument can be made that under the test now applied, *Jackson Brewing* would have come out differently, and lower courts in the Fifth Circuit should follow the current test rather than the now-superseded test that drove the result in *Jackson Brewing*.

But the Court ultimately finds this argument unpersuasive. First, at least one Fifth Circuit court has treated *Jackson Brewing*'s holding that option contracts are executory as settled law under the Bankruptcy Code (and not merely under prior bankruptcy law).[60] Further, whatever doubts some commentators have expressed, it

---

[55]  *Id.* at 623 (quoting *Ozark-Mahoning Co. v. Am. Magnesium Co. (In re Am. Magnesium Co.)*, 488 F.2d 147, 152 (5th Cir. 1974) (emphasis added)).

[56]  *Id.* at 623.

[57]  *See, e.g.*, *Ultra Petroleum Corp. v. Ad Hoc Comm. of Opco Unsecured Creditors (In re Ultra Petroleum Corp.)*, 51 F.4th 138, 153–54 (5th Cir. 2022) ("[A]brogation of a prior bankruptcy practice generally requires an 'unmistakably clear' statement on the part of Congress; any ambiguity will be construed in favor of prior practice.").

[58]  *T.G. Motors, Inc. v. C.M. Turtur Invs., Inc. (In re C.M. Turtur Invs., Inc.)*, 93 B.R. 526, 533–34 (Bankr. S.D. Tex. 1988) (emphasis added).

[59]  *Falcon V*, 44 F.4th at 353; *supra* note 49 and accompanying text.

[60]  *Wootton v. Young Family Tr. (In re Dixon)*, 990 F.2d 626, No. 92-1754, 1993 WL 117806, at *1 (5th Circ. Mar. 25, 1993) (unpublished). Wootton was designated as "unpublished," but

remains true that some other courts have found that option contracts do indeed qualify as executory under the Countryman test.[61]

Finally, despite the slight difference in the executoriness test, other aspects of the reasoning of *Jackson Brewing* arguably support the view that option contracts meet even the more rigorous Countryman test. If, as *Jackson Brewing* suggested,[62] it is true that what the holder of the option (optionee) "*had to*" do in that case sufficed to meet the standard of "obligations" under an executory contract, then it seems likely that the optionor (the party on other side of the contract, who has to stand ready to perform if the option is invoked) would also have been considered to have "obligations" under the contract. On that basis, had the *Jackson Brewing* court applied the Countryman test, it likely would have found the contract to be executory.[63]

For these reasons, unexercised option contracts similar to those in *Jackson Brewing* and before the Court today should likely be considered executory contracts under the Bankruptcy Code under governing Fifth Circuit law.

---

such decisions issued prior to 1996 *are* precedential. *See* 5th Cir. R. 47.5.3. While its affirmation of the *Jackson Brewing* principle might arguably be considered dicta, the better view is that it is not. The court in *Dixon* essentially finds that even though the option contract was at one point executory, it was no longer so; a holding that options were *not* executory would have led to the same result (i.e., a finding of non-executoriness). That said, even though its result could arguably have been reached another way, *Dixon*'s actual reasoning squarely relies on this general principle of law, stating plainly that option contracts are considered executory in the Fifth Circuit. Accordingly, this Court believes the better view is that it is not dicta (and is thus binding) in that it "constitutes an explication of the governing rules of law." *Garrett v. Lumpkin*, 96 F.4th 896, 902 (5th Cir. 2024) (quoting *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 427–28 (5th Cir. 2014)). In addition, this Court seeks to err on the side of following precedent from higher courts, whether strictly binding or not. *Cf. U.S. v. Rice*, 719 F. Supp. 3d 618, 624 (W.D. Tex. 2024) ("[A] court of inferior jurisdiction should not be slicing and dicing appellate courts' opinions as dicta or non-dicta.").

61  *See supra* note 52.

62  567 F.2d. at 623.

63  The Court notes in passing that the case law on options usually concerns not employee stock options but rather options to purchase real estate or similar transactions. The Court cannot see a relevant, principled distinction between the different types of options and accordingly applies that case law here.

**2. The Contract was likely abandoned to the Debtors, both because it was not assumed prior to the deadline as well as because it is an unassumable personal services contract.**

The Debtors' argument presumes that such a characterization of the options Contract as a personal-services executory contract would mean that the *debtor* could benefit from it. There is support for this premise. Most courts hold that when a trustee rejects an executory contract, the rights of remaining parties to a contract, which could include a debtor or third parties, are generally left intact.[64] After all, rejection is not termination of the contract;[65] it is merely a finding that to continue performing the contract would be "economically burdensome to the estate."[66] In other words, it is a disclaiming of the *estate*'s interest in the contract. This does not necessarily mean that the *debtor* retains no interest in the contract. Courts have held, with respect to residential leases, for instance, that after rejection by the estate, debtors retained whatever rights they might have in the lease or contract under non-bankruptcy law, which might include curing any defaults, remaining current on payments, or vacating the premises.[67] Such state-law contract rights will often be worthless to the debtor, in the absence of the amplified cure rights available under bankruptcy law.[68] But with an executory option contract in favor of the debtor (where neither the estate nor the debtor can really be said to have "breached" any obligation, and thus has no need to "cure"), the rights abandoned to the debtor could be quite valuable.

Here, the estate seems to have rejected the Contract by operation of law sixty days after the Petition Date.[69] And an additional reason for rejection would be that neither the trustee nor an assignee would be able to force Mr. Taylor's employer from accepting performance from someone other than Mr. Taylor; in other words,

---

[64]  *See, e.g.*, *Eastover Bank for Sav. v. Sowashee Venture (In re Austin Dev. Co.)*, 19 F.3d 1077 (5th Cir. 1994).

[65]  *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 380–81 (2019); *In re Austin Dev. Co.*, 19 F.3d at 1081–83.

[66]  *In re Austin Dev. Co.*, 19 F.3d at 1081.

[67]  *In re Rosemond*, 105 B.R. 8, 9–10 (Bankr. W.D. Pa. 1989); *Stoltz v. Brattleboro Hous. Auth. (In re Stoltz)*, 315 F.3d 80, 85 n.1 (2d Cir. 2002); *In re Baetz*, 493 B.R. 228, 235–36 (Bankr. D. Colo. 2013); *Hous. Auth. of the City of Erie v. Szymecki (In re Szymecki)*, 87 B.R. 14, 15 (Bankr. W.D. Pa. 1988); *In re Rodall*, 165 B.R. 506, 508 (Bankr. M.D. Fla. 1994).

[68]  *See* Pottow, *supra* note 50, at 1445 (explaining that "§ 365(b)'s true import is to confer a *power* upon the debtor to cure contractual defaults"), 1454 (noting that "[t]he muscular cure power of § 365(b) can be contrasted with the limited cases where cure is allowed at state law").

[69]  11 U.S.C. § 365(d)(1). The docket in this case does not reflect any motion to assume any executory contracts.

the Contract was very likely a "personal services" contract, so assumption or assignment by the estate would not be possible in any case.[70] In sum, if the Contract was indeed executory as of the Petition Date, the estate either could not, or in any case did not, assume it but instead rejected it.

Although the matter is not without doubt, numerous courts have found that rejection by the estate amounts to effectively abandoning the estate's interest in it. This rejection appears to leave the remaining parties to the Contract, namely Mr. Taylor and his employer, to proceed under it as they wished, just as they were before the Petition Date and acting under non-bankruptcy law.

### 3. Nonetheless, the estate is entitled to all but the Contested Options—because of section 541, not section 365.

The upshot of the preceding two sections is that, although the matter is not without uncertainties, the Debtors are likely correct that (1) the Contract was executory, (2) it was rejected by the estate, and, thus, (3) its benefits and burdens remain with Mr. Taylor and his employer. Because the estate's rejection and abandonment did not terminate the contract or give Mr. Taylor's employer the right to do so, the Contract remained in place and of course Mr. Taylor ultimately performed on it.

So far, the Debtors have prevailed. But where the Court parts ways with at least its understanding of the Debtors' position—which as noted was only presented orally in open court—is that in the Court's view, none of the above entitles the Debtors to anything more than they already were entitled to *before* all of the executory contract analysis above.

Section 541(a)(1) of the Bankruptcy Code awards the options themselves to the estate, and then section 541(a)(6) of the Bankruptcy Code awards their "proceeds . . . or profits" to the estate as well, aside from "such as are earnings from services performed by an individual debtor after the commencement of the case." As extensively discussed in Part A of this opinion, those provisions apply very neatly to the situation at hand. The Contract itself is best viewed merely as the operational framework under which the options yielded their proceeds. Ultimately, because the Debtor performed all of the required duties, all of the options became "vested" and entitled the holder to receive valuable shares of stock. But while the Contract is the

---

[70] *See generally* 11 U.S.C. § 365(c)(1); *Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.)*, 440 F.3d 238, 248–51 (5th Cir. 2006).

mechanism specifying the rules under which the value was ultimately earned, the Contract is not what now divvies up the valuable *property rights* between the Debtor and the estate—that happens through the working of section 541 of the Bankruptcy Code.

Although this distinction may seem a narrow one, it may be helpful to contrast this Contract with our hypothetical in the preceding section: a residential lease for an apartment in which the debtor lives. If such a lease is rejected by the trustee, the estate retains no property interest in the leasehold because the leasehold (asset) is not severable from the lease (contract); the property right lacks any conceivable independent existence. For this reason, if debtors are able (under non-bankruptcy law) to preserve and keep paying on the lease, the leasehold is theirs. Similar principles might apply to other contracts, such as contracts for services.[71]

By contrast, other assets stand on their own—they are severable from the contracts that may affect them in various ways. The rejections of such contracts do *not* by that fact alone deprive the estate of its rights in the assets (or their future proceeds or profits). For instance, consider where a debtor has made a number of payments on an installment purchase contract prepetition, thus building up "equity" in an asset. The estate might reject the installment payment contract but still retain some property interest in the asset itself, which the trustee could seek to monetize for the benefit of the estate.[72]

Mr. Taylor's options appear more akin to this latter example than to a leasehold. The options constituted intangible property granted ("awarded") at the time the Contract was entered into, and they thus entered the estate on the Petition Date. While it is true that the extent of the options' *entitlement to value* (their "proceeds" or "profits," in Bankruptcy Code terms) depends on the future contingencies spelled out in the Contract and on Mr. Taylor's employment in particular, the estate's rejection of the Contract did not oust it from the property it

---

[71]  The (counter-)example of a contract for services further illuminates our present case. If a debtor provides services under a contract that has been rejected by the estate, the estate would presumably not be entitled to any share in the compensation. This is distinct from the situation presented in this case precisely because the options became part of the estate, and thus under section 541(a)(6), their proceeds or profits also became part of the estate. But because a portion of those proceeds were Mr. Taylor's "earning," the estate has to share that portion of them. The key distinction is between a "pure" contract for services and a contract that merely specifies the conditions under which certain prepetition assets will yield proceeds or profits.

[72]  This monetization would of course be subject to various restrictions per state law, for instance, the payment of any amounts still due to lienholders.

obtained under section 541(a)(1) nor from the "proceeds . . . or profits" of that property under section 541(a)(6) (subject of course to the "earnings" limitation also contained in section 541(a)(6)).

A similar example, in which section 541(a)(6) is sometimes invoked, is professional associations that debtors may own (and work for) and that become property of the estate via section 541(a)(1). The trustee and the estate may not be able to assume, or perform under, the contracts that govern some of the organization's business relationships, but even if those contracts must be rejected by the estate, that would not terminate the estate's entitlement otherwise to monetize the business's assets used in the course of generating "proceeds" or "profits," as permitted by section 541(a)(6) (subject, of course, again, to that section's "earnings" limitation).[73]

The upshot of all of this is that the estate's interest in the "proceeds" or "profits" of the options is determined not by the executory contract doctrines of section 365 but by the doctrines delimiting "property of the estate" in section 541.[74]

---

[73] *See, e.g.*, *In re Cooley*, 87 B.R. 432, 443–44 (Bankr. S.D. Tex. 1988). *Cooley* held that the estate was entitled to the benefits of associate physicians' services despite their contracts not having been assumed by the individual Chapter 11 debtor/debtor-in-possession who was sole proprietor of medical business. Granted, in that case, the court noted that the contracts might ultimately be assumed. Still, *Cooley* helps to support the hypothetical made in the text above. Even if various important contracts were (and had to be) rejected, the debtor could have sought to otherwise monetize all assets of the business despite the rejections that might significantly change the business. In other words, the assets were not vaporized and could continue to yield "proceeds" or "profits."

[74] The Debtors' argument appears to have been presented in at least one prior reported case, *Lawton*, 261 B.R. at 776, which reasoned differently on the way to the same ultimate result. The *Lawton* court drew three conclusions. First, it determined that the contract was not executory because the options themselves were "established pre-petition and are binding on [the employer]." *Id.* at 779. Second, the court also concluded that "there was no unique performance requirement on the part of the Debtor warranting a characterization of the Debtor's employment, or the Debtor's interest in the stock options, as a personal services contract." *Id*. Third, in *Lawton*, the trustee only sought the value of the options attributable to prepetition actions, and thus to grant this relief, the Court found, did "not require the Debtor to provide any future personal services or run afoul of the limitation on the assignment and assumption of personal services contracts." *Id*.

As to the first point: as noted, this Court's executoriness analysis is subject to what appears to be binding Fifth Circuit precedent; in addition, *Lawton* may be incorrect to the extent it holds that the optionor (employer) has no material obligations outstanding under at least most option contracts. As to the second point, the Court believes that an option contract depending on

Thus, the executory contracts analysis does not add anything to (or subtract anything from) the Debtors' rights in the Contested Options as established in Part A of this opinion.

## Conclusion

This issue ultimately comes down to plain textual readings of the words of section 541(a)(6) of the Bankruptcy Code. The relevant exclusion from property of the estate turns primarily on the word "earnings." This is a commonsense term with a commonsense meaning, and it favors the Debtors here.

For these reasons, the Contested Options are property of the Debtors. The Trustee is entitled to have the value of the remaining options that were unvested as of the Petition Date turned over to him for the benefit of the bankruptcy estate.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED**:

1.     The Motion to Compel [ECF No. 24] is DENIED as to the Contested Options.

2.     The Motion to Compel is GRANTED as to the balance of the third-tranche options. The Debtors shall turn over to the Trustee the value of 78.91% of the shares received as a result of the vesting of the third tranche of options and may keep 21.09% of the value thereof, or 14.05 shares.

# # #

---

continued employment of an individual, insofar as it is otherwise considered an executory contract, likely would qualify as a personal services contract. As to the third point, the Court agrees that what the trustee requests (although broader here than in *Lawton*) does not require the assumption or assignment of a personal services contract, as explained just above. For these reasons, although it reaches the same outcome as *Lawton*, the Court does not follow *Lawton*'s analysis of the executory contract argument.